**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH DIVISION**

MATTHEW GOTTLIEB, individually and
on behalf of all others similarly situated,

            Plaintiff,                        Case No. 9:16-cv-81911-RLR

      v.                                **CLASS ACTION**

CITGO PETROLEUM CORPORATION,

            Defendant.
_____/

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**
**AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 23 and Local Rule 23.1, Plaintiff Matthew Gottlieb moves to certify a class and a subclass with respect to the two claims for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") set forth in Counts I and II of the Complaint [DE 1], to designate Plaintiff Gottlieb as class representative, and to designate the law firms of Kopelowitz Ostrow Ferguson Weiselberg Gilbert and Shamis & Gentile, P.A. as class counsel.

## I.    INTRODUCTION

The Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), and its implementing regulations were enacted by Congress and the Federal Communications Commission to "offer consumers greater protection from intrusive telemarketing calls…."[1]  Plaintiff Gottlieb, on behalf of himself and the putative classes, has brought two distinct claims under the TCPA against CITGO Petroleum Corporation ("CITGO"), arising from three (3) different telemarketing texts that CITGO caused to be sent in late 2016 to Plaintiff Gottlieb and tens of thousands of others a total of 207,479 times.  CITGO surreptitiously collected and maintained Plaintiff Gottlieb's cell phone number and the cell phone numbers of tens of thousands of others, and subsequently sent them unsolicited marketing text messages as part of a concerted, multi-year mobile marketing campaign.

To establish CITGO's liability under the TCPA, Gottlieb must show that CITGO sent, or caused to be sent, marketing text messages to the cell phone numbers of Plaintiff Gottlieb and members of the putative classes using an autodialer.  The first claim is based on CITGO's negligent violation of the TCPA, which provides statutory damages of $500 per text message.  The second claim is based on CITGO's "knowing" and "willful" violation of the TCPA, which permits the court to award damages of up to $1,500 per text message if CITGO sent the texts knowing that it did not have prior express written consent to do so.

Class certification is warranted because the relevant facts and legal issues supporting Plaintiff Gottlieb's claims are the same as those supporting all or substantially all other recipients of CITGO's unauthorized marketing text messages' claims – i.e., their cell phone numbers were obtained by CITGO in the same way and they were all sent at least one CITGO marketing text message using an autodialer.

---

[1]  Federal Communications Commission, Small Entity Compliance Guide for the TCPA (dated May 13, 2013), https://apps.fcc.gov/edocs_public/attachmatch/DA-13-1086A1.pdf.

## FACTUAL BACKGROUND

CITGO is a multinational petroleum company.  As part of its business, CITGO supplies gasoline to CITGO-branded, but independently owned, retail locations. *See* Deposition of CITGO's Corporate Representative Joseph D. Low ("Low") 13:21-15:9.[2]  Based on this model, CITGO's marketing efforts are geared towards making the CITGO brand more desirable to retailers, so that "more retailers … choose the CITGO brand, instead of "Shell, BP, ExxonMobil, [and] all the [other] different brands."  Low, 17:18-17:21. CITGO's primary means of making the brand more desirable to retailers is by driving consumers to CITGO retail locations to buy gas and "Twinkies or coke or whatever."  Low, 11:25-12:1.  Although CITGO is not engaged in direct-to-consumer sales, it engages in various forms of direct-to-consumer marketing.  Low, 11:17-12:11, 17:11-18:18.

### CITGO's Direct-to-Consumer Marketing

A key component of CITGO's direct-to-consumer marketing plan is the Club CITGO app: a cell phone app that is "a way for [consumers] to get electronic coupons to [CITGO] retail locations."  Low, 11:10-11:11. The purpose of the Club CITGO app is to increase consumer goodwill and loyalty so that the CITGO brand is more desirable to retailers.  Low, 12:7-11; Depo. Exhibit 68.

In early 2015, CITGO engaged a direct-to-consumer marketing company, Black Canyon, to implement a "mobile marketing" campaign involving text messaging.  Low, 9:25-10:13.  The mobile marketing campaign's purpose was to get consumers to download the Club CITGO app and spend money at CITGO retail locations.  Low, 10:6-17, 23:18-25:13, 54:25-56:16; Deposition of Black Canyon's Corporate Representative Kevin Brandt ("Brandt"), 16:22-18:8, 49:9-22; Deposition Ex. 4.  CITGO "saw [texting] as a viable strategy to pursue."  Low, 24:4-21, 27:8-29:5,

---

[2] Contemporaneously with this Motion, Plaintiff is filing a separate Notice of Filing Exhibits to Motion for Class Certification, which includes copies of the excerpts of depositions, deposition exhibits, discovery, and other documents cited herein.

32:23-34:1 (explaining that CITGO did some texting "pilot programs" for "proof of performance of, hey, this is … something that does have value").

At the time, CITGO's retailers were "expecting" CITGO to "continue to broaden how [it] talk[ed] about the brand." Low, 24:4-18. "[T]he retailers expect[ed] [CITGO] to be keeping up with the competition and [what] the competition [wa]s doing …." Low, 33:14-16. Therefore, CITGO would have been at a "competitive disadvantage" if it did not implement a direct-to-consumer mobile marketing campaign. Low 32:24-34:1, 48:17-49:24.

**CITGO's Scheme to Collect Cell Phone Numbers through "Text-To-Win" Promotions**

From the time CITGO engaged Black Canyon, Black Canyon's efforts were geared toward the "cultivation of a robust mobile number database, which can be used on an ongoing basis to cultivate customer loyalty, create future customer engagements and drive incremental transactions and sales." Brandt, 44:6-25; Depo. Exhibit 2; Low, 97:23-99:3. The cell phone numbers were harvested during various CITGO text-to-win promotions administered by Black Canyon at CITGO retail locations, amusement parks (i.e., Six Flags), concerts (i.e., Live Nation), and sporting events (i.e., Chicago Bulls) throughout 2015 and 2016. Low, 36:3-37:3, 76:9-79:20; Brandt, 58:19-59:13; Depo. Exhibits 6 and 16.

As CITGO's Manager of Brand Programs Joey Low explained, CITGO's text-to-win promotions worked as follows:

> [S]o typically, what we would do with a text campaign is, we would have a keyword that might make sense. So, again, to get consumers to text in to download the app, we had the text "join." And that was the keyword to 774-86. We've had other promotions out there where we use different keywords.
>
> We did some things with Live Nation…, which is part of this case. We did some things with Six Flags where we were doing some different things at the parks. We've done a "win gas" text-to-enter-type promotion. So, again, it was using keywords to the 774-86 to get people to generate interest in what we were doing.

Low, 36:3-19. "A text to win promotion is … [people in the advertising industry] would refer to it as an incentive … it gives them a reason to participate …." Brandt, 101:24-102:15.

The text-to-win promotions were generally advertised on posters, billboards, and postcards that provided consumers instructions on how to enter by text "for a chance to win":



Deposition Ex. 16[3]; *see also* Deposition Ex. 15 ("It is imperative that the [keyword to enter] is included on as many pieces of advertising real estate as possible.  Incentives and rewards should be included to make it worth the customer's while should they choose to opt in."); Deposition Ex. 17 ("Nicole worked the Hartford people pretty hard and they generated 600-plus opt ins.").

---

[3] Deposition Ex. 16 depicts the actual size of postcards handed out at Live Nation concerts (3" x 5"); *see also* Brandt, 106:20-108:1, 111:1-112:22 ("I cannot see any – I can't tell – I can't read – there's type there that I can't read at all.").

CITGO knew that text-to-win promotion participants were not providing their cell phone numbers intending to be sent future CITGO Marketing Text messages – they were providing their cell phone numbers to win a prize:

> There's – when we did things at Live Nation and at Six Flags, okay, the goal was to see if we could engage consumers outside of a CITGO gas station.  Okay?
>
> And so there was some level of incentive that we felt like that they needed to have in order to want to engage with that.  So a seat upgrade, that would be a nice incentive if I won that.  Okay?  So that was kind of an attempt to get the brand out in front of people.
>
> Again, if -- if at the concert or at Six Flags they're saying, "Wow, I really like CITGO. Now I'm going to go and do business with those retailers that sell CITGO gasoline, I'm going to buy stuff from their store," then that's a positive. That's kind of our goal of our overall marketing.

Low, 117:22-120:8; Deposition Ex. 61.

Black Canyon reaped Plaintiff Gottlieb's cell phone number for inclusion in CITGO's "robust mobile number database" during two text-to-win promotions staged at a Dave Matthews Band concert at the Coral Sky Amphitheatre in West Palm Beach on July 31, 2015.  CITGO's Answer to Interrogatory No. 5.  The first involved "Text[ing] CITGO1 to 77486 for a chance to win a $100 CITGO Gift Card."  *Id*.  The second involved "Text[ing] CITGO2 to 77486 for a chance to win a seat upgrade" at the Dave Matthews Band concert.  *Id*.  However, Gottlieb did not win a CITGO Gift Card or a seat upgrade.  Instead, more than a year after the concert, Gottlieb, and members of the Classes were sent three (3) unsolicited CITGO marketing text messages.

### CITGO's Marketing Text Blasts to Text-to-Win Participants

In late 2016, CITGO authorized Black Canyon to blast three (3) different CITGO marketing text messages a total of 207,479 times (the "CITGO Marketing Texts").[4]  The CITGO Marketing Text blasts were sent almost exclusively to cell phone numbers of participants of some of the CITGO text-to-win promotions that Black Canyon collected and maintained on CITGO's behalf over an almost two year period, including Plaintiff Gottlieb's, which was sent all three blasts.[5]  Low, 93:21-24, 142:1-10; Brandt, 144:5-152:8; Deposition Exs. 29, 30 & 32; CITGO's

---

[4] Black Canyon sent a fourth CITGO marketing text blast in December 2016, after Plaintiff Gottlieb filed his complaint, and after Black Canyon manually removed Plaintiff Gottlieb's cell phone number from CITGO's robust mobile number database.  Low, 94:23-96:15.

[5] An estimated 30,000 of the CITGO Marketing Texts sent in October were sent to cell phone numbers obtained by CITGO exclusively through CITGO's website, and are excluded from the

Answer to Request for Admission Nos. 3 & 5.  CITGO "was involved" in the creation of the content of the CITGO Marketing Texts and "instructed" Black Canyon to send them to lists of cell phone numbers associated with specific CITGO text-to-win promotions.   Low, 100:3-106:25, 147:14-149:5; Deposition Ex. 55.

The first text blast ran for three days, between August 7 and August 9, and was sent to 47,711 unique cell phone numbers, including Plaintiff Gottlieb's on August 8 at 11:08:23.827 pm. Low, 142:1-3; Brandt, 149:19-152:8; Deposition Ex. 32.  The first text promoted CITGO's Ultimate Road Trip Sweepstakes and the Club CITGO app:



Like other CITGO promotions, the CITGO Ultimate Road Trip sweepstakes was an "advertising campaign to drive brand awareness." Low, 17:11-18:6.  Although 2016 was the third year of the promotion, "[i]t was the first year that [CITGO] incorporated Club CITGO into it, and it was actually the first text blast [CITGO] had done." Low, 90:14-17.  CITGO retailers were pleased with the Ultimate Road Trip campaign because they "saw more traffic" and sales. Low, 90:24-91:15.

The second text blast was completed between October 4 and October 6.  Low, 142:4-7; Brandt, 149:19-152:4; Deposition Ex. 32.  The second text was sent to 93,666 unique cell phone

---

class. *See* Low, 147:14-148:9 (distinguishing "web opt ins" from CITGO text-to-win promotion participants sent the October CITGO Marketing Text blast).

numbers, including Plaintiff Gottlieb's on October 5 at 8:23:55.370 pm.  The second text promoted CITGO's Win Gas For a Year Sweepstakes and the Club CITGO app:



The third text blast was executed between November 6 and November 8, and resulted in the transmission of 66,102 texts to unique cell phone numbers, including Plaintiff Gottlieb's on November 7 at 8:19:37.199 pm.  Low, 142:4-7; Brandt, 149:19-152:4; Deposition Ex. 32.   The third text also promoted CITGO's Win Gas For a Year Sweepstakes and the Club CITGO app. Deposition Ex. 30.

These CITGO Marketing Texts were "*deliberately* sent," and CITGO knew that they were "*unsolicited*."  Low, 116:12-117:17; Brandt, 40:3-41:5; Deposition Ex. 59 ("we have to be careful on how many texts we send *unsolicited* during the time frame").[6]

**CITGO's Use of an Autodialer to Send the Marketing Text Blasts**

At CITGO's request and on CITGO's behalf, Black Canyon sent each of the more than 205,000 texts comprising the three CITGO Marketing Text blasts primarily to cell phone numbers associated with various CITGO text-to-win promotions using the same technology – an

---

[6] All emphases are supplied, unless otherwise stated.

autodialer.[7] Brandt, 28:16-29:11. The autodialer had the capacity to generate random or sequential cell phone numbers from a list and to send them a preprogrammed text message in connection with the text-to-win promotions. Brandt, 87:4-91:20, 95:1-99:5; Deposition Exs. 12 and 13. The autodialer also had the capacity to send CITGO's preprogrammed Marketing Texts on a schedule to lists of CITGO text-to-win promotion participants' cell phone numbers. Brandt, 135:10-142:13 ("We refer to a text blast as a message that would be sent to the database directly."); Deposition Exs. 7 and 11 ("These are scheduled by time and date so they could in effect be sent within minutes provided we have pre-programmed the message. … However, we don't recommend doing so because it creates a bad user experience."); Deposition Ex. 27 ("Yesterday the blast was approximately 66K sends. Today will be around 18K sends.").

For the three CITGO Marketing Text blasts, pursuant to CITGO's instructions, Black Canyon preprogramed the content of the texts and set the date and time for them to be sent by the autodialer. Brandt, 67:16-70:12 ("Messages are autodialed."); Brandt, 85:16-86:15; Deposition Ex. 19 (proposed disclaimer language from SMS aggregator mGage: "Messages sent from automated system."). After Black Canyon preprogrammed the text blasts, other than monitoring the autodialer results, it was not involved in transmitting the CITGO Marketing Texts; they were automatically sent. Brandt, 67:16-70:12.

**CITGO's Lack of Prior Express Written Consent to Send Autodialed Marketing Texts**

CITGO intended that all consumers participating in text-to-win promotions be sent a substantially similar series of preprogrammed text messages immediately after texting the designated keyword:

> So the next message that they get back after they text that keyword is going to be … a little more consistent, based on whether it's "join" or "win gas" or whatever, it's probably a very similar -- it's probably a very similar message they're receiving.

Low, 35:25-39:19. CITGO hoped that this series of preprogrammed text messages would be sufficient to obtain prior express written consent from text-to-win participants, which CITGO

---

[7] Black Canyon, in turn contracted with mGage, an SMS aggregator, to enable it to send the CITGO Marketing Texts. *See* May 19, 2017 Joint Report [DE 23]. An SMS aggregator has preexisting agreements with domestic wireless carriers, and provides marketers like Black Canyon a gateway to the wireless carriers' networks to enable it to send text message blasts. mGage is in possession of, and is in the process of producing, records necessary to identify all of the cell phone numbers to which the three CITGO Marketing Texts were sent. *Id*.

knew is required under the TCPA in order to later send marketing text messages to these cell phone numbers using an autodialer.  Low, 44:24-46:7, 61:11-62:6, 114:14-22; Deposition Ex. 15 ("Federal law requires that all text message recipients provide express consent ….  Even though consent is implied by texting a promoted keyword to the corresponding short code, a double opt-in confirmation is still required.").  Specifically, as part of the sequence, CITGO wanted text-to-win participants to text back the letter "Y" to confirm that they intended to participate in the text-to-win promotion:



Low, 112:20-113:24; Brandt, 54:19-55:6; Deposition Ex. 57.

However, this preprogrammed series of texts including the text requesting the "Reply 'Y'" were **not sent** to some or all text-to-win participants, including Plaintiff Gottlieb.[8]  Instead, when Plaintiff Gottlieb and others texted to enter a CITGO text-to-win promotion, they were sent a text message that included a link to the promotion "Rules," but that did not require any potential

---

[8] The parties have recently been advised by Black Canyon that it now believes it failed to send the preprogrammed series of messages that included the "Reply 'Y'" text on CITGO's behalf to thousands of concertgoers that participated in CITGO text-to-win promotions, including Plaintiff Gottlieb.  *See* Errata Sheet for the Deposition Transcript of Joseph Low.  There is also evidence that Black Canyon failed to send the preprogrammed series of text messages to text-to-win participants at other types of events.  CITGO-07108 (Email from Six Flags to CITGO: "Also are there 2 steps to enter the text to win? I think you have to reply back 'yes' after they text to win. Some guests never got the reply back message from CITGO").

The parties agree that they will be able to ascertain the identity of all class members, those text-to-win participants who were sent CITGO's Marketing Text messages were sent the preprogrammed series of text messages when they entered the promotion, and which were not, based on the discovery currently being sought from mGage.  *See* May 19, 2017 Joint Report [DE 23]; Errata Sheet for the Deposition Transcript of Joseph Low.

manifestation of consent to be sent autodialed CITGO Marketing Text messages or otherwise make any reference to future, autodialed marketing text messages from CITGO:

> Your entry has been received. Thanks for playing and enjoy the show! Rules at: http://bit.ly/1an56QL Reply HELP for help, STOP to cancel. Msg&data rates may apply.

mGage Message History Lookup for Plaintiff Matthew Gottlieb's cell phone number.  Black Canyon, acting on CITGO's behalf, did not make any attempt to obtain express *written* consent from Plaintiff Gottlieb and thousands of other text-to-win participants before sending them CITGO's Marketing Text messages in 2016.[9]

Regardless, CITGO would still have lacked the prior express *written* consent required by the TCPA to have Black Canyon send autodialed marketing text blasts on its behalf even if CITGO had properly sent the request for the "Reply 'Y'" to Plaintiff Gottlieb and all other text-to-win participants and they had replied "Y," because the text messaging disclosures in the "Rules" or "Terms" texted to Plaintiff Gottlieb and all other members of the Classes were not "clear and conspicuous," as required under the FCC's 2012 TCPA Order:

> So again, so we don't – I don't think that we specifically say what we're going to send later to them, okay, when we do that.  But – but with the -- you know, again, with the – kind of the [abbreviated hyperlink to the] terms [in the next message that they get back after they text the keyword] ….

Low, 38:6-13, 41:22-42:15.  All of the "terms" or "rules" for the text to win promotions sent to all text to win promotion participants, including Plaintiff Gottlieb, involved a substantively similar

---

[9] Following the commencement of this action – perhaps recognizing its failure to attempt to obtain on CITGO's behalf express *written* consent to send Plaintiff Gottlieb autodialed CITGO Marketing Texts – Black Canyon criticized Gottlieb for asserting his legal rights under the TCPA.  *See* Deposition Ex. 35 ("I reviewed the complaint and while I am not a lawyer, everything in there looks like it's bull and he's fishing.  Probably playing a game of chicken with a major oil company just to get a settlement.  My guess is he was wasted at the Dave Matthews Band show, texted in to try and get a seat upgrade and then forgot about it until he got the Win Gas for a Year message.").

disclosure relating to future text messages from CITGO.  Brandt, 72:4-73:14, 77:18-78:6 ("Yes, similar, correct.").

With respect to future texts, the promotion rules or terms provided – in the middle of the section relating to entering the text to win promotion "Via Text Message" – that "Promotion entities also reserve the right to send up to 4 autodialed text messages per month":

Deposition Ex. 10 (exemplar text rules, as viewable on iPhone 4 screen (3.5" x 2"), outlined in red); *see also* Low, 114:4:13 ("the challenge is, it's a phone, it's a small screen").

Notably, it "wasn't … important" to CITGO whether "everybody read [the purported texting rules] before they continued to get more messages."  Low, 40:13-41:19.  In fact, CITGO expected that consumers would **not read** purported rules relating to future marketing text messages if they were hidden in a hyperlink:

| From: | Kovacsik, Charlie [/o=CITGO/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Kovacsik, Charlenea03] |
| on behalf of | Kovacsik, Charlie |
| Sent: | 5/12/2015 2:11:16 PM |
| To: | 'Melissa McLeanas' [mMcleanas@sftp.com]; Jeca Salas [jSalas@sftp.com] |
| Subject: | RE: CITGO newsletter LINK |

We currently are not linking to anything other than the rules. How often does anyone actually clink on a link if they know how to figure out the program. I am confident we will not see traffic to the link it is more of the disclaimer link.

*** (13 minutes later) ***

| From: | Kovacsik, Charlie [/o=CITGO/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Kovacsik, Charlenea03] |
| on behalf of | Kovacsik, Charlie |
| Sent: | 5/12/2015 2:24:54 PM |
| To: | 'Melissa McLeanas' [mMcleanas@sftp.com] |
| CC: | Jeca Salas [jSalas@sftp.com] |
| Subject: | RE: CITGO newsletter LINK |

I said clink instead of click. See how little anyone cares about clicking we are clinking instead ☺

Low, 40:13-44:2, 74:2-75:24; Deposition Exs. 45 and 46. And, consistent with CITGO's expectation that text-to-win participants would not know they were consenting to be sent future, autodialed marketing text messages, the vast majority of class members – if not all of them – did not click the hyperlink to the rules and terms website and review the rules and terms, and CITGO knew text to win participants would be annoyed once CITGO "start[ed] *working the database* with other offers." Brandt, 91:21-94:23, 101:2-101:13; Low, 143:10-22 ("people opt out to those text messages"); Deposition Ex. 14, 11 and 22; *cf*. Deposition Ex. 20 ("People may not even go to the link, but there are always a few weasels put there who are trying to trip you up").

Prior to and during this litigation, CITGO effectively conceded that the "Reply 'Y'" text sequence – i.e., its only attempt to obtain express written consent to send future autodialed marketing text messages from some text-to-win participants – "may not be clear" about CITGO sending future marketing text messages using an autodialer. Low, 111:1-112:24, 113:25-115:22, 152:8-156:10; Deposition Exs. 58 and 72.

II.   **LEGAL ARGUMENT**

**PLAINTIFF'S CLAIMS FOR VIOLATION OF THE TCPA
ARE IDEALLY SITUATED FOR CLASS-WIDE TREATMENT**

Claims for violation of the TCPA are ideally suited for class treatment. *See* TCPA, 47 U.S.C. §§ 227(b)(1)(A), (b)(3) (establishing a statutory remedy for "any call [including a text

12

message] (other than a call made for emergency purposes or with the prior express consent of the called party) using an automatic telephone dialing system" to a "cellular telephone"). The "large number of claims, along with the relatively small statutory damages, the desirability of adjudicating these claims consistently, and the probability that individual members would not have a great interest in controlling the prosecution of these claims, all indicate that [a] class action would be the superior method of adjudicating" them. *C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 691 (S.D. Fla. 2014); *see also Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, No. 12-22330-CIV, 2014 U.S. Dist. LEXIS 177222, at *22-23 (S.D. Fla. Dec. 23, 2014) (citing *C-Mart*); *Meyer v. Portfolio Recovery Assocs., LLC,* 707 F.3d 1036, 1045 (9th Cir. 2012).

Courts in this district and throughout the country regularly certify TCPA class actions in situations such as this, where the defendant obtained all the class members' numbers in the same manner and all class members are sent the same potentially violative communications. *See e.g. Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 699 (S.D. Fla. 2015) ("The facts necessary to establish liability relate to Defendant's common course of conduct and the transmissions of the faxes, and not to issues with individual class members."); *Physicians Healthsource*, 2014 U.S. Dist. LEXIS 177222, at *13 (certifying TCPA class where the consent defense could be resolved on a class-wide basis as a matter of law); *Manno v. Healthcare Rev. Recovery Grp., LLC*, 289 F.R.D. 674 (S.D. Fla. 2013) ("The uniform consent argument, based on the hospital admissions paperwork, is subject to classwide resolution, as all putative class members filled out the same paperwork."); *cf. Newhart v. Quicken Loans Inc.*, No. 9:15-CV-81250, 2016 U.S. Dist. LEXIS 168721, at *11-12 (S.D. Fla. Oct. 12, 2016) (denying class certification because "the Court would need to examine different forms of written consent for different borrowers to determine whether they comply with the FCC's regulations").

### A.      The Proposed Classes

Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), Plaintiff seeks to certify the following Class and Subclass (collectively, the "Classes"):

(**1**) Class: All persons in the United States who had one or more of the CITGO Marketing Texts sent to their cellular telephone number.

(**2**) Subclass: All persons in the United States who (1) had one or more of the CITGO Marketing Texts sent to their cellular telephone number and (2) were not sent a "Reply 'Y'" text by Black Canyon on CITGO's behalf and/or did not reply "Y" after being sent a "Reply 'Y'" text.

Excluded from the Classes are any persons whose number CITGO obtained exclusively via CITGO's website, CITGO, CITGO's directors and officers, immediate families of CITGO's directors and officers, or the legal representatives, agents, affiliates, heirs, successors-in-interests or assignees of any such excluded person.

### B.    Legal Standard Governing Class Certification

The decision of whether to grant class certification is within the Court's sound discretion. *DeLeon-Granados v. Eller & Sons Trees, Inc.*, 497 F.3d 1214, 1218 (11th Cir. 2007). "In light of the fact that Rule 23 provides a district judge with great flexibility to adopt appropriate procedures, certify conditionally, or decertify a class in later stages of litigation, th[is] Circuit has held that judges should err in favor of certification." *Id.*

A class should be certified if it meets the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *See* Fed. R. Civ. P. 23; *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1321-22 (11th Cir. 2008). To meet Rule 23(a)'s prerequisites, Plaintiff must demonstrate that:

1) The class is so numerous that joinder is impracticable;

2) There are questions of law or fact common to the class;

3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4) The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1-4).

Here, Plaintiff seeks certification under Rule 23(b)(3). *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). Rule 23(b)(3) further mandates that Plaintiffs demonstrate that common questions of law or fact "predominate over any questions affecting individual members" and that maintaining a class action "is superior to other available methods" of adjudication. Plaintiff's proposed classes meet all of these requirements.[10]

### a.   The Proposed Class is so Numerous that Joinder is Impracticable.

Rule 23(a)(1) requires a showing that that "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). There is no "definite standard" for satisfying this requirement in terms of how large the class must be, and it is not necessary to know the actual

---

[10] The class certification decision is generally made apart from deciding the merits. "[A] court should not determine the merits of a claim at the class certification stage." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009). Instead, courts should consider the merits only "to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Id.*

class size. *Fabricant v. Sears Roebuck, et al.*, 202 F.R.D. 310, 313 (S.D. Fla. 2001) ("There is no definite standard as to the size of a given class, and plaintiff's estimate need only be reasonable.") (citing *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986)); *see, e.g., Legg v. Spirit Airlines, Inc.*, 315 F.R.D. 383, 388-89 (S.D. Fla. 2015) ("Parties seeking class certification do not need to know the 'precise number of class members,' but they 'must make reasonable estimates with support as to the size of the proposed class.'").

A class of 40 members is generally deemed adequate; however, a class that numbers in the thousands "clearly" satisfies the numerosity requirement. *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); *Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 674 (N.D. Ill. 1989). "[W]here the exact size of the class is unknown, but it is general knowledge or common sense that it is large, the court will take judicial notice of this fact and will assume joinder is impracticable." 3 NEWBERG ON CLASS ACTIONS § 7.22 (4th ed. 2002).

The proposed Classes here easily meet the numerosity requirement. CITGO's, Black Canyon's, and mGage's records establish that for the members of the Classes, approximately 170,000 text messages were transmitted in three tranches to tens of thousands of unique cell phone numbers. Joinder of tens of thousands of class members is impracticable and, therefore, the numerosity requirement is satisfied. *See Shamblin v. Obama*, No. 8:13-cv-2428-T-33TBM, 2015 U.S. Dist. LEXIS 54849, at *13 (M.D. Fla. Apr. 27, 2015) ("While 'mere allegations of numerosity are insufficient,' Fed. R. Civ. P. 23(a)(1) imposes a 'generally low hurdle,' and 'a plaintiff need not show the precise number of members in the class.'").

### b. Questions of Law and Fact are Common to the Class.

The test for commonality is whether the class claims present "questions of law *or* fact common to the class." Fed. R. Civ. P. 23(a)(2) (emphasis added). This is another "low hurdle." *Williams,* 568 F.3d at 1356. To satisfy it, Plaintiff need only to show that the class claims present "at least one issue whose resolution will affect all or a significant number of the putative class members," or that their claims "are susceptible to class-wide proof." *Williams*, 568 F.3d at 1355. In other words, commonality requires that the claims of the class "depend upon a common contention . . . of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 (2011).

In this case, Plaintiff has alleged that CITGO violated section 227(b)(1)(A)(iii) of the TCPA. Plaintiff's claims raise multiple common legal and factual issues, including:

- Whether or not CITGO made a call, and whether that call was for emergency purposes as defined by 47 U.S.C. § 227(b)(1)(A);

- Whether the equipment used to send CITGO Marketing Texts satisfies the definition of an autodialer as set forth in 47 U.S.C. § 227(a);

- Whether CITGO's Marketing Texts were "telemarketing" as defined by 47 CFR 64.1200(f)(12);

- Whether CITGO's disclosures regarding future autodialed telemarketing texts were "clear and conspicuous" as defined by 47 CFR 64.1200(f)(3), (f)(8)(i);

- Whether the CITGO Marketing Texts were sent willfully and knowingly in violation of the TCPA;

- Whether any of CITGO's affirmative would prevent Plaintiff and the class from recovering damages i.e., whether the TCPA violates the First Amendment to the U.S. constitution and whether the relief Plaintiff seeks would constitute an excessive fine in violation of the Eighth Amendment to the U.S. Constitution.[11]

Because CITGO obtained the members of the Classes' cell phone numbers in the same way and imposed on all members of the Classes the same terms relating to future marketing text messages and all members of the Classes were sent the same CITGO Marketing Texts using the same technology, Plaintiff's claims do not turn on individualized issues.  Instead, Plaintiff will use common facts to answer all of the above common questions.  *See, e.g., Lardner v. Diversified Consultants Inc.*, 17 F. Supp. 3d 1215, 1222-23 (S.D. Fla. 2014) ("It qualifies as an autodialer under the statute because it automatically dials telephone numbers from a preprogrammed list."); *Manno*, 289 F.R.D. at 687 (finding consent defense to be common where all class members were subject to the same TCPA related disclosures); *Bennett v. Boyd Biloxi, LLC*, No. 14-0330-WS-M, 2015 U.S. Dist. LEXIS 59632, at *9 (S.D. Ala. May 6, 2015) ("Because the calls encouraged recipients to engage in future purchasing activity, they also constituted telemarketing."); *Stewart v. Regent Asset Mgmt. Solutions, Inc.*, No. 1:10-CV-2552-CC-JFK, 2011 U.S. Dist. LEXIS 50046, at *17 (N.D. Ga. May 4, 2011) ("to establish a *knowing* violation of the TCPA for an award of

---

[11] Although Plaintiff believes all issues in this case can be resolved on a class-wide basis, class certification is still appropriate even where some individualized issues still exist. *See Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036, 1060 (2016) ("[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members").

16

treble damages, a plaintiff must prove only that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct itself constituted a violation" (emphasis in original)).

Moreover, should Plaintiff ultimately succeed in this action, both he and the proposed Classes will be entitled to identical statutory damages.

### c. Typicality

The typicality element of Rule 23 requires that Plaintiff's and the Classes' claims "arise from the same event or pattern or practice and are based on the same legal theory." Fed. R. Civ. P. 23(a)(3); *Williams*, 568 F.3d at 1356-57. "[T]ypicality measures whether a significant nexus exists between the claims of the named representative and those of the class at large." *Hines v. Widnall,* 334 F.3d 1253, 1256 (11th Cir. 2003). Yet, the "[c]lass members' claims need not be identical to satisfy the typicality requirement; rather, there need only exist 'a sufficient nexus between the legal claims of the named class representatives and those of individual class members to warrant class certification.'" *Ault v. Walt Disney World Co.,* 692 F.3d 1212, 1216 (11th Cir. 2012).

The required nexus exists "if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *See Ault,* 692 F.3d at 1216. Thus, a "plaintiff establishes typicality by showing 'a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class.'" *Tillman v. Ally Fin. Inc.*, No. 2:16-cv-313-FtM-99CM, 2017 U.S. Dist. LEXIS 1887, at *13 (M.D. Fla. Jan. 6, 2017); *see Sarris*, 311 F.R.D. at 696 (finding typicality "because Plaintiff, like each of the class members, was purportedly sent the same fax and each class member's claim is based on the same legal theory and same set of facts as Plaintiff's claim.").

Here, CITGO obtained Plaintiff's and the Classes' cell phone numbers in the same way. Plaintiff and the Classes were subjected to the same CITGO Marketing Texts program, and their claims rely on the same legal theory: that CITGO sent telemarketing text messages from an autodialer in violation of the TCPA. Plaintiff was sent three marketing text messages promoting CITGO on August 8, October 5, and November 7 2016 after participating in two text-to win promotions. CITGO's Answer to Interrogatory No. 5. These CITGO Marketing Texts were sent by Black Canyon on behalf of CITGO and were automatically dialed with an autodialer from saved lists. This exact set of facts is applicable to the entire class. Plaintiff will need to prove the same elements for the class members' claims. Accordingly, the typicality requirement is satisfied.

### d. Adequacy

The adequacy element of Rule 23(a)(4) requires that Plaintiff and his counsel be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This means Plaintiff must have "no interests antagonistic to the class," and his counsel must be qualified to represent the class. *Fabricant*, 202 F.R.D. at 314-15.

Plaintiff meets this test because his interests are squarely aligned with the Classes. Like members of the Classes, Plaintiff claims that Defendant violated his rights under the TCPA by sending unsolicited text messages. Furthermore, Plaintiff has no interests antagonistic to those of the Classes.  *See* Declaration of Plaintiff Matthew Gottlieb.

The firms and counsel representing Plaintiff, Kopelowitz Ostrow Ferguson Weiselberg Gilbert and Shamis & Gentile, P.A. are also adequate.  Both firms have extensive experience in the area of consumer rights and class action litigation. They have litigated multiple cases nationally (in several federal district courts), and have the resources necessary to conduct litigation of this nature. Plaintiff's attorneys have been appointed as lead class counsel in several cases in the Southern District of Florida, as well as other jurisdictions (*see* Kopelowitz Ostrow Ferguson Weiselberg Gilbert and Shamis & Gentile, P.A. firm resumes). Plaintiff's counsel have diligently investigated and dedicated substantial time and financial resources to the investigation and prosecution of the claims at issue, and will continue to do so. *See*, *e.g.*, *Fabricant*, 202 F.R.D. at 315 (plaintiff's counsel adequate because they "are experienced in class action litigation."). Accordingly, Plaintiff and his counsel meet the adequacy requirement.

### e. Predominance

Common questions of law or fact predominate "if they 'ha[ve] a direct impact on every class member's effort to establish liability on every class member's entitlement to … relief." *Williams,* 568 F.3d at 1356 (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004)).[12] An inquiry into the predominance of common questions of law or fact "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Prindle v. Carrington Mortgage Servs., LLC,* 3:13-CV-1349-J-34PDB, 2016 LEXIS 112881, at \*7 (M.D.

---

[12] Rule 23(b)(3) does not require all issues presented in the case to be common among the class. It requires only that the common issues predominate over any individual issues. *Klay*, 382 F.3d at 1254 ("it is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions."), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

Fla. Aug. 24, 2016). Common issues predominate if those issues that are subject to generalized proof predominate over those that are subject to individualized proof. *Id*., *citing Veal v. Crown Auto Dealerships, Inc*., 236 F.R.D. 572, 579 (M.D. Fla. 2006).

In this case, the common questions identified in Section I(C) are all subject to class-wide proof. CITGO's marketing scheme entailed a uniform course of conduct that resulted in each class member receiving almost identical text messages which were transmitted *en masse*. In consequence, there can be no serious contention that common questions do not predominate.

### f.  Superiority

Rule 23(b)(3)'s superiority prong requires a finding that a "class action is superior to other available methods for fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). "Rule 23(b) was designed for situations ... in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate." *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 953 (7th Cir. 2006). The superiority analysis focuses "not on the convenience of the burden of the class action suit per se, but on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiff's". *Klay*, 382 F.3d at 1269. Critically, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23." *Gen. Tel Co. of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982).

Courts routinely find that class actions are the superior method for adjudicating TCPA claims. A single lawsuit adjudicating the question of whether CITGO violated the TCPA is superior to countless identical individual lawsuits pressing the very same questions, and potentially resulting in inconsistent rulings. *See Birchmeier*, 302 F.R.D. at 255. In this case, CITGO has engaged in serial violations of the TCPA that cannot reasonably be refined into individual actions. Even if individual litigation was feasible, however, a class action is still superior because it would be judicially inefficient to have multiple courts consider and adjudicate the same factual, liability and statutory damage issues this case presents. *See Agan v. Katzman & Korr, P.A.,* 222 F.R.D. 692, 700 (S.D. Fla. 2004) ("increased efficiency" can also render class action superior), *quoting Sikes v. Teleline, Inc.,* 281 F.3d 1350, 1359 (11th Cir. 2002).

### g.  Ascertainability

"In order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970).

19

"Class members need not actually be ascertained prior to certification, but each individual's class membership must be ascertainable at some stage in the proceeding." *Bush v. Calloway Consol. Group River City, Inc*., 3:10-CV-841-J-37MCR, 2012 LEXIS 40450, at *4 (M.D. Fla. Mar. 26, 2012). In other words, "a class description must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Catron v. City of St. Petersburg*, 8:09-CV-923-T-23EAJ, 2010 LEXIS 35193, at *1 (M.D. Fla. Mar. 11, 2010); *see also Rink v. Cheminova, Inc*., 203 F.R.D. 648, 659 (M.D. Fla. 2001). Thus, "it is not fatal for class definition purposes if a court must inquire into individual records, so long as the inquiry is not so daunting as to make the class definition insufficient." *Agne v. Papa John's Int'l*, 286 F.R.D. 559, 566 (W.D. Wash. 2012) (certifying TCPA text class). Rather, "the class simply must meet a minimum standard." These elements can be evaluated based on entirely objective criteria.

Here, the parties agree that membership of the class is readily ascertainable based on records being produced by mGage, the SMS aggregator used by Black Canyon to facilitate sending the CITGO Marketing Texts.  *See* May 19, 2017 Joint Report [DE 23]; Errata Sheet for the Deposition Transcript of Joseph Low.  Indeed, based on the initial production of those records, Plaintiff has already been able to identify approximately 96,000 unique cell phone numbers that were sent at least one of the CITGO Marketing Texts.  A reverse phone number lookup can identify the names and addresses associated with each such cell phone number. Courts throughout the Eleventh Circuit have approved use of reverse lookup in connection with identifying class members in TCPA actions.  *See*, *e.g.*, *James v. JPMorgan Chase Bank, N.A.*, No. 8:15-cv-2424-T-23JSS, 2016 U.S. Dist. LEXIS 137022, at *6 (M.D. Fla. Nov. 22, 2016) (holding that reverse phone number lookup was sufficient to satisfy Rule 23's "best notice" requirement); *Soto v. The Gallup Organization, Inc.* No. 13-cv-61747-MGC (S.D. Fla. Nov. 24, 2015); *Guarisma v. ADCAHB Medical Coverages, Inc.*, No. 13-cv-21016 (S.D. Fla. June 24, 2015); *De Los Santos v. Millward Brown, Inc.,* No. 13-cv-80670 (S.D. Fla. Sep. 11, 2015).

## IV.   CONCLUSION

Based on the foregoing, Plaintiff Gottlieb respectfully requests that this Court grant class certification, appoint him as representative of the Classes, appoint Kopelowitz Ostrow Ferguson Weiselberg Gilbert and Shamis & Gentile, P.A. as class counsel, and establish a deadline for submission of proposed class notice.  A proposed Order will be submitted together with Plaintiff's reply memorandum.

## V.     REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(b)(2), undersigned counsel, on behalf of Plaintiff Matthew Gottlieb, requests this honorable Court grant oral argument on his Motion.  Undersigned counsel estimates the time required for oral argument to be approximately one hour.

Dated: June 2, 2017.

Respectfully submitted,

By: /s/ *Avi R. Kaufman*
Avi R. Kaufman (Florida Bar No. 84382)
KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, Florida 33134
Telephone: 305-384-7562
Email:  kaufman@kolawyers.com


Jeff M. Ostrow (Florida Bar No. 121452)
Scott A. Edelsberg (Florida Bar No. 100537)
KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT
One West Las Olas Boulevard, Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
Email:  ostrow@kolawyers.com
Email:  edelsberg@kolawyers.com


Andrew J. Shamis (Florida Bar # 101754)
SHAMIS & GENTILE, P.A.
14 NE 1st Ave., Suite 400
Miami, Florida 33132
Telephone: 305-479-2299
Email:  ashamis@sflinjuryattorneys.com

*Attorneys for Plaintiff Matthew Gottlieb*
*and all others similarly situated*

21

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 2nd day of June, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I also certify that the foregoing document is being served via transmission of Notices of Electronic Filing generated by CM/ECF.

By: /s/ *Avi R. Kaufman*